Case number 18-1188, Otsego 2000 et al. Petitioners v. Federal Energy Regulatory Commission Mr. Sussman for the petitioners, Mr. Danley for the respondent, and Mr. Stetson for the intervention May it please the court, good morning, I'm Michael Sussman, I represent the petitioner, Otsego 2000 Your honors, Article 3, Section 2, Clause 1 requires injury in fact that is fairly traceable to a defendant's action and may be redressable by favorable judicial decision. The Supreme Court reiterated that basic rule in Bank of America Corp. v. City of Miami. In this case, your honors, no party to the appeal nor intervene to challenge the standing of Otsego 2000, but the court last week in a memo requested address to that issue. So I would like briefly at least to address that issue and answer any questions which the court may have with respect to that matter. To establish its standing under long- I just have a quick question. Yes, your honor. Does the organization have members? It does not, your honor. No members. It's not a membership organization. To establish its standing, an organization must demonstrate, however, that it committed and expended significant resources to accomplish organizational purposes which the challenged agency action frustrated and that those purposes fall squarely within those forwarded by the statute the organization seeks to vindicate. Havens Realty v. Coleman established those principles and they've been applied numerous times since. Indisputably, and affidavits from JA 260 to 292 establish this, Otsego 2000 expended significant organizational resources to ensure proper scrutiny by FERC of this pipeline compressor station expansion project. During the administrative review process, it raised numerous issues central to its organizational mission, the preservation of the unique environment in and around Cooperstown, New York. This appeal derives from a broader rehearing petition in which Otsego 2000 raised numerous issues, not now before the court, but particular local environmental and aesthetic concern. Otsego 2000 ultimately concluded that FERC had addressed some of these issues and obtained some concessions of importance to its organizational purpose from the pipeline company. How do you distinguish your case from Pruden-Waterwatch? My understanding, Your Honor, is that here there was an intense set of organizational activities which were never challenged with regard to standing by anyone. That the organization doesn't make any difference. It doesn't matter if no one challenged it. We have an independent obligation to determine our case. I understand. I understand you have that obligation. But here, Your Honors, the intense and particularized and concrete injury to the organization stems from the lack of inquiry by FERC with regard to an issue of particular importance to that agency, to that organization which has been maintained by that organization throughout the litigation, which is the need to examine the impacts of this particular project with regard to GHG. This particular inquiry must be justiciable in some manner. The nature of the injury here is such that if one applies a too rigorous standing doctrine, it will never be subject to review. Well, it could be subject to review by people who live near the project, or it could be subject to review by an associational standing. But an organization... But organizational standing does not depend, Your Honor, solely on membership. There are cases, there are cases which indicate... It doesn't depend on it. That's the whole point. So you have to establish organizational. But you said just now that if we don't give you standing, no one will admit standing. I don't understand why that would be the case. Well, in this particular, I'm speaking about this instance. And here there was a Valentine family. But if you look at the GHG issue, the Valentine would have no greater standing, in fact, than this organization. This organization has been advocating for a period, intensely for a period of years, with respect to this issue. They're the ones who've raised the issue. The Valentines were part of the matter, but why would it matter conceptually if the Valentines were part of the case in addition to this organization? This organization has had as a principal purpose the vindication of this matter and the insurance that public information is provided, which would allow careful analysis in this case and in every case. Let me try to ask a standing question a slightly different way. Sure. Is there anything in the declarations in this case, in your declarations, that show that the commission's approval of this project has impaired the organization's ability to do its work, other than the time and resources you spent on the project? Absolutely. Where? Point to those. That's what you need to show. The work that the organization do is educational. No, no, no. You need to show me something in the declarations. Sure. And remember, I'm looking for something that shows that the commission's approval of the project has impaired the organization's ability to function, but it has to be something other than the time and resources the organization spent on this case. I understand. I think that's what our holdings are. I think that if you look at the affidavits of both Mr. Hsu and Ms. Huntsman specifically, they explain that one of the organizational purposes to advance public education and understanding with regard to the issue of GHG. What the failure of FERC to do the analysis entails is a lack of public information, which is relevant to this organization's intent and purpose to educate and advocate. Without a neutral, and FERC ought to be a neutral, doing the analysis required, what you end up with is a polarization. You have advocacy groups on the one hand, you have advocacy groups on the other hand, and you have no governmental agency, despite NEPA, which is doing the required analysis. That makes the process of public education and advocacy, which this group is dedicated to in its particular region, much more difficult. And that is an injury, in fact, because what is required by NEPA is the rigorous analysis of all significant environmental effects. And with this agency, one would expect this agency would be a fact-gathering agency, has, in fact, abdicated its responsibility over and again, notwithstanding the decision by this Court in the Sierra Club case, has abdicated its responsibility. And what that does for organizations like this, Your Honor, is make public education and advocacy more difficult and more polarized. And that is an injury, in fact. That would seem to mean that any organization that has as its object education and advocacy is going to have organizational standing in any agency dispute, because they can say that their ability to advocate and educate is impaired by an agency not doing its job. I mean, that may be a perfectly, you know, sound argument, but I don't see how that's consistent with food and water law. Well, I think the Supreme Court in Spokio addresses this issue in a more particularized way at page 1549 and 1550 of its decision. And there, what the Court majority says, and I'm quoting, is the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified, and they cite Federal Election Commission v. Aikens, and they cite Public Citizen v. Department of Justice. In those cases, those petitioners sought particular information to which they were, quote, unquote, entitled. They would deny that information, which was relevant to their advocacy and educational purposes, and the Court found those denials to give them standing. My argument is that very similarly here, advocacy organizations that are working in the public interest to deal with the effects of greenhouse gases are curtailed in that mission by FERC's refusal, systematic refusal now because of its rulemaking in this process, systematic refusal to gather information in project-specific cases. And that particularly curtails advocacy, to answer your question, Judge Tatel, in this instance where an organization's purpose is to focus on a specific geographic region, which this entity is clearly doing. They're not any entity. They've been doing this since 1981, and trying to advocate for the aesthetic, environmental, and economic success of that region. A project like this, which has potentially deleterious effects, cannot be properly analyzed if FERC is going to abdicate its responsibility, and that does impede its ability, that is, the organization's, to fulfill its purpose. So you're right. I agree, Judge Wilkins. It may be a somewhat expansive doctrine, but I think it's still tailored to that organization's proven track record and purpose. It's not just any organization. It's an organization which has, and that's where the Coleman Standards come in, devoted significant resources over time to this particular purpose. And that advocacy is demonstrated here by Oswego's 2000's participation through the years in this process, and it's raising and focusing on this very specific issue. So I do think that's sufficient to distinguish it from other organizations, which are either more free-floating, if you will, in their advocacy. Here, you're wedded to a specific geographic area where this project is forwarded. And to your question, Chief Judge Garland, it may be that there are others who have standing. But that, there's no doctrine which says that only one party may have standing. I'm running to your argument that it's either you or nobody. I agree. There could be, in this case, as I was trying to explain, it's us or nobody. It's not that in general there might not have been someone. As I pointed out, the Valentines were in this case through the proceeding. There was a dispute as to whether they were properly referenced in the petition for review, and we didn't bother to take that point up. You didn't bother to do what? I'm sorry. We didn't bother to appeal. It was a decision made. I know. I know that. So you're not contesting. The Valentines aren't petitioners. That's correct. As I said, in a footnote, we make that point. So it rises and falls on the standing of your reorganization. That's correct. I'm not arguing that, Judge. Okay. I think we should give you a chance, as other judges have a question, to go to the merits. Go ahead. Okay. I've reserved three minutes. I'll try to speak briefly to the merits. Basically, our view of the merits is very simple. NEPA requires the broadest inquiry as possible. And in this sense, it is interestingly analogous to the standing doctrine in the Fair Housing Act, where the Fair Housing Act provides standing as most broadly possible. NEPA has a similar substantive provision. There is supposed to be broad review. What's happened here, and it's not unique to this particular case, it's now been generalized in a number of cases, is that FERC takes the position that certain empirically discernible matters, which ought to be reviewed so the public can understand whether a project meets the NGA standard and the NEPA standard, which relates to public interest, public benefit, that relates particularly at this point in time to the critical issue of greenhouse gas emissions, the quantum of those emissions, what alternatives there are to those emissions in a particular case. If we don't do it in one case, the Hegelian principle is very simple. We don't generalize it to other cases. Likewise, if we generalize it, we do it in each case. It's very simple. Here what FERC would like to do is never do it. Now, that's very industry cozy. We understand all that. But the public interest demands more. And so the question is, what do we do with the fact that, on remand, the commission tried to do, you know, the analysis in Sierra Club, and what our court said was, look, do the analysis or explain why you can't, but you can't just kind of like take the ostrich approach. Yes, Your Honor.  I mean, I'm not saying that we couldn't do the analysis because of the lack of data and, you know, all of the assumptions, et cetera, that were necessary. And that was not reviewed. And that was not reviewed. It seems like, you know, you're trying to do an end run around that case. I don't think so. Because that case, as Your Honor recognizes, the review that this Court did compelled them to do the analysis. The analysis may be doable or not doable in any particular case. Here, they did not do it nor explain why they couldn't do it with any degree of specificity. So I don't think you can get around it that simply. They should be compelled to do the analysis. There is no basic reason. And the science advances daily, and it's quite clear from the presentations that have been made by the amici of this case that the analysis on both ends, up and downstream, is possible to do. And what their title, I'm sorry. I just want to pick up at your point there. The Commission says that that's not possible. And they say asking the project applicant for that information would be an exercise in futility. And then they say why, because the only thing the applicant is doing is delivering the gas to the contracted delivery point. So they've given us a paragraph here about why they don't, the Commission doesn't think it can get the information. And our review is for arbitrary and capricious review, right? Yes, Your Honor. So how do we, what's your best argument for saying that that's, the Commission's explanation for why it can't get the data you want was arbitrary and capricious? Well. Because that's what we have to find. It's arbitrary and capricious because NEPA commands FERC to do a broad review. FERC is entitled to say to an applicant, in order to meet our obligation, we need from you certain information. In this particular case, they do know the two entities, Brooklyn and Mohawk, with whom they have contracts. They also are aware of the proportion or percentage of the end use which will be combustible, how it will be combustible, roughly. As this Court has said, you don't need exactitude to do the analysis. So the idea that they cannot do the analysis, which our own experts have estimated in our papers, and we did that in its submission below, and others have estimated is simply arbitrary and capricious. They're not making an effort. My time is up. But they do give, see, what I'm getting at is they give us these reasons. And one of the reasons they give is they say, look, it's designed for intermittent peak use. It's not even clear what volume of gas will actually be consumed. My point is, I understand you don't agree with those reasons, but what's our basis for saying they're arbitrary and capricious? Well, one basis certainly would be to look at the dissentants in the case. It's a 3-2 vote in our case. And look at the reasoning they adopted, which is far more persuasive as to the availability of analytic tools which would overt supersede what's being said by the three majority members. In other words, it would seem to me that there's a strong basis to say it's arbitrary and capricious when the two dissenters point out exactly why the reasoning of the majority is not only facile, but it is subject to a belief that political influences are involved. And you know what fosters that here? You know that, and I'm sure the Court is certainly aware of this because you've referred to it in the Sable decision. There are executive orders. There are regulations which the various environmental entities have already forwarded which show how to do the analysis. It was only by an executive order by the President which basically commandeered those and say don't do them. There are already established ways of doing this which have been recognized. What should we take from the fact that they, that Lisa Ms. Lafleur, who was on the original panel, didn't dissent until the rehearing when the policy issue was raised? Is she dissenting only to the policy change? Why didn't she dissent from the original decision? Well, she obviously, Your Honor, would have to answer for herself. My interpretation of her ---- But you're drawing our attention to the fact that there were dissents. I'm reading the dissent, and the way the dissent reads to me, she is making clear that the analysis which Justice Tatel is referring to, Judge Tatel is referring to, is doable. Thank you. Thank you. I'm sorry, Judge. I'm only suggesting where you should be. Several of you. Several of you. But that's another question for a different day. Anyway, the point is, she, whatever her motivation, whatever her timing, people come to things late. She does present, as does Commissioner Glick, a roadmap for how the analysis could be done. My time is way past, and I thank you for your indulgence. Don't go away yet. I have a further question. I'm happy to be here, but I don't want to overstay my welcome. We'll hear from Mr. Danley. Is that right? May it please the Court, I'm James Danley, on behalf of the respondent of the Federal Energy Regulatory Commission. I think the briefs do an excellent job laying out most of our position, but I want to mention a couple of things, beginning with one quick clarification. The standard for NEPA review is not and cannot be the broadest possible inquiry, as the opposing counsel stated. In fact, NEPA is guided by a rule of reason, which ensures the agencies determine whether and to what extent to prepare documents in the NEPA process based on the scale and scope of the project in question. That has to be the case because NEPA, by CEQ regs, actually contemplates a cascading set of different types of documents depending upon just how large the project is. EAs are contemplated to be short and concise. EISs are far more involved. So it cannot be the broadest possible analysis in all circumstances. That would involve an infinite period of time looking at every conceivable aspect. I would like to talk about standing for just a brief moment. Because representational standing is not available to Otsego, organizational is the only one that can be available, and there is a distinction to be made from the case that was cited by opposing counsel regarding the inability to If the interest of the organization is impaired and the actions by the government actually trammel them doing their work, that is one thing. And so if you restrict them from getting information, that is actually impeding their activities. However, the vast majority of cases that are cited in the declarations refer to expenditures that the case law is fairly persuasive don't count. For example, educating the public, that's food and water watch, that doesn't count. Funds spent on litigation or in the pursuit of specific advocacy, again, doesn't count. And remember, that goes back to the basics of standing. Lujan requires a particularized injury. And when you are advocating for an outcome for a rule that will ultimately be promulgated that's generally applicable, that's not particularized. Further, the reallocation of lobbying expenses in Center for Law and Education, that doesn't count. So instead, these have been described by the courts variously as self-inflicted injuries that are the decisions made by the organizations. Let me just interrupt you. I agree with you about most of the declarations. But in the Dillingham, I think, is it Dillingham? It's the, yeah, the Dillingham affidavit says that since the project was approved, they spent time and money monitoring air quality and other health consequences of the project. Why isn't that enough? Yes, sir, your honor. It's at paragraph six. So you, in fact, anticipated where I was going with this. The vast majority, as I said, clearly fall into that handful of off-limits categories to establish standing. But there are a couple of places in which the declarations talk about the spec analysis, and that is described unevenly across the declarations. So in some of the declarations, it appears that that is a form of mitigation of the consequences of the decision made by government. And that, depending upon how the panel construes those declarations, could be enough. Other declarations, though, make it fairly clear that when it was originally started, for example, in the SHU declaration, paragraph 13, that's JA 282, that this was done for the purpose of litigation. Quoting, in early 2015, Otseger realized that independent air quality and public health data should be collected to document current conditions. Well, what do we do when we have two declarations that seem one would be adequate and one suggests it may not be? I'm so sorry, Your Honor. A little hard of hearing. Oh, sorry. What do we do when we have two? Because I saw that point you just made also. One affidavit says they're doing monitoring. The other suggests that perhaps that monitoring is related to the litigation, right? Yes. What do we do when we have two affidavits that seem to say different things? Is it enough that one of the affidavits is by itself sufficient? Or if the other affidavit undermines it, what do we do with that? So the first thing to mention is that at the outset of litigation, it is the petitioner's burden to establish their standing. Only if it's not self-evident. That's true. Yes, sir. Obviously, nobody complained about their standing here, so it's a little hard to say, right? That is true. Okay. You didn't. Dominion didn't. Nobody did. Only we did. Sorry. Picky, picky, picky. No, no. No, Your Honor. I acknowledge that you didn't. I realize that. But that goes to the question of self-evident, doesn't it? Come on. It has to. It does, but you have an independent responsibility to do exactly what you did, which is to look into it. To decide standing, but not to resolve the self-evident issue. Right. No, that's true. Okay. I would say that that horse has left the barn. It's not self-evident if we're engaged in 15-minute colloquies at this point based on the possible information. But the question is whether they had to do it when they filed their petition. Yes. Okay. The horse hadn't left the barn at that point. So the ‑‑ it is required to establish standing at the time the Article III action commences. Advanced Management Tech, the FAA, 211F3RD633, that's a 2000 decision from the D.C. Circuit, says that if the petitioner lacks standing at the time the action commences, they are not entitled to a federal judicial forum. So in the opening salvo of approaching the bench here to get relief, that standing has to be demonstrated. Now, I'm saying that as a mandatory requirement to open the courthouse doors. I haven't yet spoken as to what you should do, which was your original question, Your Honor, when you have seemingly conflicting affidavits. My response to that is I could imagine any number of scenarios. One is they began it in anticipation of litigation and realized, wow, this is really going to be helpful down the road, and they continued it. Maybe that transmogrification of purpose is sufficient. I'm not sure that it can actually be extracted from the affidavits as written, but that is, of course, a decision for you to make. Further, it could be that different people who are acting as officers of the organization had different purposes. I don't know. All I can say is that it is rather equivocal what the purpose of it was, and to the extent that it does fall within American society for prevention of cruelty to animals, requirement that litigation and advocacy not count to confer organizational standing, I think that forecloses their opportunity here. Did I answer your question properly, Your Honor? Why don't you go on to the merits? I mean, unless others have. But let me start you on the merits, okay? Yes. Is it the commission's view that if it can't identify the customers and their location, as they could in Sierra Club, that the greenhouse gas emissions are not reasonably foreseeable? No, Your Honor. Is that the commission's position? That is not the position. It is not a simple matter of that. Well, what is the commission's position? The commission's position is when the emissions of downstream GHG, when downstream GHG emissions are reasonably foreseeable, then an inquiry will be performed as required by NEPA. That's not my question. My question was, is it the commission's position that they're not reasonably foreseeable in situations where you can't identify the location and nature of the customers? That's my question. It is the commission's position, as expressed in the order on remand after Sable Trail, that under certain circumstances, the court had instructed us in Sable Trail that there is a direct connection that is reasonably foreseeable. It has to be on a case-by-case basis because every one of these projects is different. So I would be reluctant to draw a line that is not in any of the commission's promulgations and is not mandated by the court. If we look at the facts of Sable Trail – I'm sorry, Your Honor, please. Okay. In this case, the commission says, unlike Sable Trail, we don't know who the customers are, right? This gas is just being delivered to local distribution companies, right? Yes, Your Honor. But why not – why shouldn't the commission ask for it as part of the application process? The commission says that would be futile, but how does the commission know that unless it asks? So that, of course, is a question that could have been asked. It's worth mentioning that they are not jurisdictional to us, and so we can't compel the application. No, no. You asked the applicant. Oh, the applicant. Okay, sure. That, of course, is a question that could be asked. Right. That's my question. I think it's worth keeping in mind several things. I mean, that's what the dissenter points at. The dissenter says the commission doesn't know because the commission doesn't ask, right? So why not ask? So, Your Honor, there are any number of possible questions that could be asked in the scope of any NEPA process. This process produced an EA because it is a relatively small project of 60 acres, not of new linear pipe, but instead of just additional intermittent compression capacity that is located at a couple of compression stations. Even given the fact that there was a reduced scope because it was an EA, not an EIS, the process was quite robust. I just want to interrupt you about that. I don't mean to interrupt you, but that was a question I wanted to ask you. Is that significant in terms of the regulatory requirement of how you assess an indirect effect? Does it make a difference that Sierra Club was an EIS and this is a not? No, it doesn't go to whether or not the indirect effect analysis changes. That is the same process. I'm sorry. So just my simple question is I understand that this is not a great big project, but why does the commission say it would be futile to ask? So there are two reasons why this information is in itself not the dispositive thing that the petitioners or dissenters might think, and if you'll indulge me in just two seconds, I'll explain. The first reason is that this case is unlike Sable Trail in that Sable Trail had a pipe to generators. That was the entire purpose in the words of the court for the project. It had a clear heat rate and efficiency, and you knew what the chemistry would be at the end of burning the gas that the court said was reasonably foreseeable. In this case, we have multiple compounding uncertainties, and I want to be clear. Arithmetically, this is multiplicative, not additive. Every time you increase one of these degrees of freedom in the calculation, it becomes harder and harder to tether any number to reality, so it becomes more and more arbitrary. This is a small project. It is for additional capacity only. It is on an intermittent basis for peak use. Unlike the generators, LDC's customers vary widely in the efficiency of the burn. But all the gas is going to be burned, correct? No, so the gas will ultimately go somewhere to be burned, but what's important to understand here, and I was about to come to that as the next point, the LDC's are connected to other transmission pipelines, which means they could displace. This additional compression at peak times could displace more expensive gas from other transmission pipelines connecting to Mohawk and Brooklyn. They wouldn't be buying the gas if they weren't going to burn it, correct? They would not buy gas if they were not going to burn it. But the point is that for every—we do not know, and we cannot know, I argue, that if just because they buy this gas to burn it, and they don't always burn it, often their marketing affiliates will sell it if they don't need it, the capacity is released. But assuming that they do burn it, that could just as easily displace gas coming from another— I got that. I understand that. But you say these are good reasons why on this current record the Commission doesn't know. Yes. My only question is why not require the applicant to ask its customers for as much information on that subject as possible? Maybe in the end you'll never get it, but unless you ask, you're just guessing here. It could have been asked for. I will say that in the process of an NOI for scoping, a scoping meeting, an NOI for a second scoping meeting, a second scoping meeting, the promulgation of the EA, the acceptance and response to comments, the initial decision certifying the project, and then rehearing, that was not a subject that was demanded throughout the process when the opportunity to raise infirmities in the record could have arisen. We don't have a— Are you saying then that CIGO did not ask you to ask? During the process of producing the EA, that's correct. Did they ask— What they asked was— Did they raise us in their petition for rehearing? Yes. They asked for—well, in the petition for rehearing, they did ask for specific analysis, but in the process when the NEPA document was being produced, they asked for a lifecycle— I can't remember the wording, I'm afraid, but it's the lifecycle analysis, which would be the broadest possible inquiry, to use the opposing counsel's terminology, and that simply is not a requirement under NEPA. So your argument then is that all the issues I'm raising about why the commission didn't ask are not properly before us? That's correct. Those are forfeited. We do not argue that there is forfeiture of arguments that are based directly on the legal holdings of the 2017 Sierra Club decision, but as it comes to the NEPA document, that extremely robust process with multiple opportunities to weigh in and critique, those have to be forfeited. There has to be some degree of finality. NEPA and the commission's processes contemplate that. Now, I am well aware of the fact that I've gone 20 minutes over. Do you have any further questions, Your Honors? No, I'm out. Thank you. Thank you, Your Honor. Ms. Stetson. Good morning, Your Honors. May it please the Court. My name is Kate Stetson, representing the Intervenor Dominion Transmission. I want to start by clarifying a couple things on standing, if I could. Judge Tatel, you asked about the Dillingham Declaration and, in particular, whether the paragraph devoted to discussion of monitoring was or was not separate from the litigation, because, of course, we know from Food and Water Watch and from other cases that expenses that are incurred, including in investigating before litigation, or expenses relating to testing to see if the defendant has violated the law, are self-inflicted injuries. That's what this Court called it in the Equal Rights Center v. Post Properties case. So if you look at the Dillingham Declaration in paragraph 6 on Joint Appendix 274, Ms. Dillingham begins by saying, When it became apparent that our efforts to stop the project or secure needed mitigation might fail, CIGO 2000 began to document baseline conditions at the site. So that was investigation, obviously, in preparation for litigation. And I say that because, as Mr. Danley touched on, the tenor and the thrust of all of these declarations, save, of course, for the Valentines, who are not petitioners here, but the thrust of all of these declarations is that there was time and money and resources spent in opposition to this project. And you can see that in the Pope Declaration at pages 5 and 6, Joint Appendix 269 to 270, Dillingham Declaration 5, Schuh Declaration pages 3 to 11, all of them detailing the investigation and opposition that went into this project. That was the basis for standing. Now, what you heard Mr. Sussman say this morning is something quite different. What you heard Mr. Sussman say, attaching himself to FEC v. Aikens, is this is an informational injury. You did not hear Mr. Sussman cite anything to a declaration because there's nothing in the declarations, or in the brief, for that matter, which doesn't contain a standing section, that talks about the kind of informational injury that FEC v. Aikens was talking about. That is the difference, I would say, between this case and a case like PETA, which involved a denial both of information that an entity said that it needed in order to advocate, and a denial of an avenue of redress for that organization to challenge certain treatment of certain types of poultry that weren't covered under a particular regulation. That is an informational injury that at times has been found to give rise to standing. There is nothing in these declarations that supports this belated claim of informational injury. And I would say, too, that the standing here is not self-evident. My failure to raise standing in the brief was an oversight. And I say that because in the usual case, as Judge Tatel, you pointed out, an organization like this usually has members that advocate for their own recreational or aesthetic interests. I made the assumption that this was one such entity. It's not. We've established it doesn't have members. We've established it's an organization seeking its own standing. And these declarations establish that the basis for its standing is improper. Briefly on the merits. Can I just ask you a specific question about that, which is I'm curious about your reactions to the question I was asking Commission Counsel about whether or not it's really futile for the commission to ask your client to produce as much information as possible about where and how this gas will be consumed. I think I probably have three responses, if I could. The first is to echo Mr. Gamley's point that this, of course, was not an argument that was presented to the commission. So it's forfeit. Set that aside. The second point is to echo your observation that when you're talking about the commission's explanation, there's only a certain extent to which the court probably should dig underneath that. But the third substantive response is when it comes to finding information about one's customers' customers, I do think that it is futile in this context, even if you could take a snapshot at any particular time about where certain gas is either coming from or going to when it is routed through a local distribution company, through that LDC's pipeline systems, and to a number of end customers, all of whom may change depending on the weather in the year. Even if you could take a snapshot of that at some time during the scoping process, that snapshot wouldn't do much good at the time of decision or at the time of challenge. How do we know that unless we ask? I'm sorry. How do we know that unless we ask? In other words, I hear what you're saying, and I understand what the commission says about this, but it seems curious to me that everybody is saying, you say in your brief, you say in your brief at page 23, you say how gas will be used is not foreseeable. The commission says it's futile to ask. But we wouldn't be guessing about any of this if the commission were required to simply ask Dominion to get all the information it can about the use. And maybe the answer from Dominion's customers will be, you know, we just don't know because it could go here, it could go there. We don't know what time of year it will be. Then we'd have a record. We just don't have that. Well, I think there are many aspects of this appeal that we wouldn't be guessing about if the petitioner had raised them below. You have the joint appendix 84, the commission saying no parties. But suppose they had raised them. Suppose they had raised the indirect effects that we're now talking about. Let's just assume for a minute we don't agree that it's not raised. It's hypothetical. Assuming that it's raised. Why not ask? I think the reason not to ask is, for the most part, the reason that I've already given, which is NEPA is not a statute that asks for information for information's sake. And if you have FERC, if you have the commission explaining to this court. Susan, this is information about whether or not there are indirect environmental effects from the project that the commission is about to license, namely emission of greenhouse gases. That's not information for information's sake. Well, with one exception with respect to the methodology question that Judge Wilkins asked, which I wanted to get to in a moment. But with respect to your question about customers' customers, to some extent I think this is information for information's sake because of the changing nature of that customer base. So simply asking for information about every possible customer upstream or downstream is not necessarily going to inform FERC's view. When the commission says it's not achievable for us to ask questions about the pipelines or in this case the compressor station modifications leading to the LDCs which lead to customers, I think there is an extent to which we need to take that futility determination on its face. The other related issue, and the one I mentioned that relates to the question Judge Wilkins asked, if I could pause on this for just one minute, there are of course differences both in foreseeability and causation between this case and Sable Trail. But the question about it I think is an important one too because Sable Trail held that the commission either had to explain itself or do the analysis. And here at Joint Appendix 100 to 101, the commission explains why it cannot do the analysis. So when I talk about information for information's sake, even if the commission were required to go back and gather information about Dominion's customers' customers, even if the commission were required to go back and analyze emissions from indirect effects which were not preserved below, at the end of the day you would have the problem that the commission on Remand and Sable Trail identified, which is that the commission has yet to come up with a viable method for testing how those emissions affect climate change project by project. But I mean I guess after Sierra Club or Sable Trail, given the way that the NEPA regulations are written, I'm talking about 40 CFR, 1502, 0.22, and I think it's 0.23. Those are written on the assumption, right, that the agency is willing to get all available information and try to get complete information because it says that where the information isn't available or complete, then the agency should explain why that is. So you wouldn't have that regulation stating that obligation unless it were assumed that an agency would make every attempt to get complete information that is available. So given that and given what we said in Sable Trail, why isn't Judge Tatel completely right that, you know, there should be at least an obligation to make the record? I think that it pains me to say Judge Tatel is wrong, but the reason that Judge Tatel is not completely right is that in this case, what the commission is being asked to do is something the commission has already explained why it cannot do. That was not the case in Sable Trail. Well, actually, the commission's explanation about why it can't get the information is all about upstream effects. There's almost nothing on downstream other than this sentence about intermittent upstream. Well, I think there are two different strands of argument here. One of them has to do with information gathering, and one of them has to do with using the information to assess climate change. Your questions, Judge Tatel, are about the information gathering. And you're right. With respect to upstream effects, as this Court has held in other Sierra Club cases, the 827F39 Sierra Club, upstream information about where gas is coming from, when the commission says we don't know where in this shale play the gas is coming from, that is sufficient. You're right. I wasn't — I mean, just speaking for myself, I thought the commission's explanation about upstream was fine. But by contrast, there's nothing quite like that for downstream. No, and I think that is because the commission — It's because the commission doesn't ask. I'm sorry? Never mind. I'm sorry. The commission, with respect to downstream, explained why this case was different from sable trail with respect to reasonable foreseeability and causation. It didn't rely on an information issue with respect to downstream. But with respect to what the commission can do with that information, that was my point to Judge Wilkins. I'm not sure why. So it seems to me you're mixing two arguments. You're mixing the first argument about how much gas is going to be emitted with the second argument, which is what is its consequence for climate change. And in sable trail, we distinguished those two arguments. We concluded that there was an indirect effect with respect to the release of the gas. And we said — so we say our discussion so far has explained that FERC must either quantify and consider the project's downstream carbon emissions or explain in more detail why it cannot. Then it goes on to a second argument. Sierra Club proposed a further ethical step. That's the one about social cost of carbon. That's the one that's discussed at 100 to 101. But we've never suggested that even if FERC thinks that it can't evaluate the climate effect, that it doesn't have to evaluate the emissions effect. In fact, we have subsequent cases where we agreed that social cost of carbon wasn't the model that they had to apply. But that didn't absolve them of responsibility for the indirect effect of gas release. And I think you're mixing the two arguments. I don't intend to, Chief Judge Garland. My point with respect to the indirect effects is — and this, again, assumes you get past standing in our failure to preserve argument. My point on indirect effects is that there are qualitative distinctions between this case, both with respect to the scope of the project and reasonable foreseeability and causation that distinguish it from sable trail in that respect. My further point on the use of the information, even if it had been gathered, was that NEPA is a rule-of-reason statute. And when you have the commission already on record — So is your position that even if it were foreseeable how much greenhouse gas — how many, how much, whatever the right word is for volume — greenhouse gases were emitted because it all went to a single plant and it was all burned in that single plant, and every day we knew exactly how much was released, you would say still not required because there's no test like social cost of carbon which can evaluate greenhouse gases. Is that your position? Because I think that's totally inconsistent with what we said in — It's also not the commission's position. Right. I think it is. It's consistent with what the commission says at pages 100 to 101 of the joint appendix. No, that's why they reject the social cost of carbon test. That's not why they reject the indirect effect. But let me just be clear on Dominion's position. Dominion's position is that even if every single bit of the gas could be traced to a burn in one location, that would still not — the burn would still not be an indirect effect because you couldn't measure its effect on climate change rather than just on the release of gas. Is that your position? I see your point. No. If what we are doing here is looking at something that looks exactly like a sable trail scenario, you have a pipe to a plant that's going to burn the gas, I don't think it would be available to us to argue that that's not an indirect effect. That's what I understand the second point. Yes. And it is the second point that I was making, which is what do you do with that indirect effect? That's a separate argument about what they have to do anymore after that. That's correct. Let me ask you another question. With respect to the policy change? Yes. All right. I understand the argument that this is within the discretion, it's an enforcement question, different administrations take different positions, et cetera. One of the reasons that they give is — and this is at page 86 — is a causation reason. That is, if the argument — on the one hand, you could say the argument is simply we, FERC, are saying that if NEPA doesn't require us to do it, we're not going to do it. That's a classic discretion argument. I can't tell, frankly, whether that's the position they're taking or whether they're taking the position reflected in the previous paragraph that there's no causation because the grant of the Certificate of Need and Necessity, Convenience and Necessity, isn't enough for causation. Because that part seems inconsistent with our decision as here. I think if it were the latter, that does seem inconsistent. I understood paragraph 44 of the commission's decision — this is Joint Appendix 86 — to mean that after experimenting for a couple years with setting out upper-bound theories, that the commission took care, I think, in those cases to explain we are not attributing causation to these numbers, we're just going to lay these numbers out, that the commission concluded, just as you mentioned, Chief Judge Garland, in a policy decision, that it was no longer going to incorporate that into its environmental NEPA analysis, that it was not useful for all of the reasons that it had explained. It wasn't useful to the NEPA analysis if it couldn't tie those upper-bound effects to either reasonable foreseeability or causation. That is — It's the causation question I'm interested in. Yes. Do you read them as taking the position that the legal causation is not satisfied by the commission's ability to grant or not grant the certificate? I don't read them as taking that broad position, because I think Sable Trail forecloses that broad position. What Sable Trail held, of course, was that where you have a pipeline delivering gas to a plant, the certificate process was a legal cause of that. What I understood the commission to be saying here is that where you have not a pipeline delivering gas to a plant, but modifications to or a couple new compressor stations delivering gas to a local distribution company, which delivers it through its pipes to unknown end users, you don't have the kind of pinpoint legal cause that you have — The commission doesn't have authority to do this. That's my understanding, yes, that there are just too many additional data points, essentially, between what approval is happening here, the approval to modify a compressor station, and the end-use burning of the gas that was found to be sufficiently correlated in Sable Trail to be a legal cause. That is a very hyper-attenuated chain here where it wasn't in Sable Trail. Let me ask if there are other questions from the bench. Thank you very much. Thank you. I know the petition doesn't have time, but we've given the other side some extra time, so we'll give you two extra minutes. I just want to point out from the record that there was preservation at all levels with regard to the issues before the court. First at JA 174-175, which is an excerpt from the letter dated December 3, 2014, which was an attempt to guide the commission in what it would, in fact, review. There's a plain request for what's called cumulative upstream and downstream impact study, comprehensive build-out analysis of potential negative downstream and upstream, et cetera. That's there. So to the extent that's being represented the opposite, I don't believe it to be accurate. Does that, do those documents, do they say that the commission should be asking Dominion to ask its customers for this information? It specifically asks for, these include but are not limited to, the likelihood of future power plants, storage facilities, distribution networks, and other types of gas infrastructure. That information could only be obtained, as I understand, for exposition from the customers. So it's not, it doesn't say specifically ask your customers, but the nature of the analysis requested makes clear that the information would have to be gathered. So I don't think there's any valid distinction there. On 11-18-15, in light of what was produced, there were additional comments made, and I'll point out JA-221 and 222 for the record. Again, I won't read it, but it makes very clear the nature of the inquiry asked for. And, in fact, obviously that inquiry could not have been engaged without the information Judge Taylor, you're referring to. And then at 246 and 247, the hearing application petition, again, there's very clear indication of the scope of what's being argued here. There's no change in scope. Thank you for your attention. Okay. Thank you. We'll take a matter under submission. We'll take a brief break while the next group comes up.
judges: Garland, Tatel, Wilkins